LIND v. STATE.

Opinion delivered November 18, 1918.

1. SEDUCTION — SUSPENSION OF PROSECUTION — MARRIAGE. — Kirby's Dig. § 2044, providing for suspension of prosecution for seduction where defendant marries the female, is for the benefit of the accused; and where he was forced to submit to the marriage cer-

emony, there was no marriage, and the statute had no application on a resumption of the prosecution by reason of desertion of the female.

2. SEDUCTION—HARMLESS ERROR—INSTRUCTIONS.—In a prosecution for seduction accused could not have been prejudiced by the reading of Kirby's Dig., § 2044, to the jury, prosecution having been resumed after being suspended by reason of a forced marriage, the indisputable testimony being that accused wilfully abandoned the prosecutrix without legal cause.

3. SEDUCTION—CORROBORATION.—In seduction where accused admitted the sexual act, further corroboration of the prosecutrix as to that fact was unecessary.

4. CRIMINAL LAW—CONFESSIONS AS EVIDENCE.—Where a confession was once voluntarily made, the fact that appellant afterwards repeated the confession under duress did not destroy or lessen the effect of the volutary confession.

5. CRIMINAL LAW—CONFESSION—CORROBORATION.—Although, under Kirby's Dig., § 2385, one could not be convicted of seduction upon his confession alone, yet, when combined with testimony of prosecutrix establishing the *corpus delicti*, it is sufficient.

6. SEDUCTION—CORROBORATION—CONFESSION.—Although, under Kirby's Dig., § 2043, one cannot be convicted of seduction upon the uncorroborated testimony of the prosecutrix, yet, when combined with a confession made by the accused out of court, is sufficient to convict.

7. CRIMINAL LAW—INSTRUCTIONS.—It was not error to omit from a requested instruction where the court expressly charged as to sucn omitted matter in another instruction.

8. WITNESSES—IMPEACHMENT—TESTIMONY BEFORE GRAND JURY.— Under Kirby's Dig., § § 2195, 2196, minutes of the testimony before the grand jury cannot be used as original evidence to impeach a witness, but it can be used to refresh the memory of grand jurors called as witnesses.

9. WITNESSES—IMPEACHMENT—TESTIMONY BEFORE GRAND JURY.—A State's witness may be impeached by showing that he made statements before the grand jury contradicting his statements on the trial.

10. WITNESS—IMPEACHMENT—FOUNDATION.—To impeach a witness by proof of contradictory testimony before the grand jury, a proper foundation should be laid by asking the witness whether he had made the alleged statement before the grand jury.

11. CRIMINAL LAW—NEW TRIAL—NEW EVIDENCE—DILIGENCE.—A party asking a new trial for newly discovered evidence should show facts from which it will appear that he could not have ascertained or obtained the evidence by reasonable diligence.

Appeal from Pulaski Circuit Court, First Division; *Jno. W. Wade,* Judge; affirmed.

STATEMENT OF FACTS.

This appeal is from a judgment of conviction of the crime of seduction. Eva Wilder, the prosecutrix, testified that she was 23 years of age; that she had kept company with the appellant off and on for two or three years up to the middle of March, 1917, when she had sexual intercourse with him. During the year preceding he had visited her sometimes two or three times a week and sometimes about once a month. Appellant had other company during that year before the month of February, but not thereafter. Appellant and the prosecutrix went together about a month before the act of sexual intercourse. Appellant told the prosecutrix that it was all right for them to have sexual intercourse and her love for him and his promise to marry her induced her to yield to his embraces. The prosecutrix at the time was a virgin. The date fixed for their marriage was July 8, 1917. Appellant was with her that night. She told him of her condition and he said he was not able to marry. He went away to Oklahoma. Prosecutrix gave birth to a child. Appellant returned and they were married October 10, 1917, and lived together until October 12, 1917, when appellant deserted her. She gave him no cause whatever for deserting her. He went away to attend the funeral of his uncle, and told prosecutrix he would be back that evening or the next morning on the local. Everything was perfectly pleasant between them. The prosecutrix did not see him any more until October, 1918.

The father of the prosecutrix, R. L. Wilder, testified that the appellant worked for him in the year of 1912. He was at witness' home often during the years of 1915, 1916 and 1917; visited his daughter once or twice a week. Witness' daughter and appellant went out to gatherings together. During appellant's visits to his daughter, witness did not think that any one else visited her. Witness further testified on direct examination that

he went to Oklahoma to get the appellant to come back and marry his daughter as he had agreed to do. Witness walked up to him where he found him and spoke to him as usual, saying, "Hello, Joe," and appellant spoke to witness and witness called him to one side and said, "Joe, I want to see you a little bit. I come for you to go back and cover up your wrongs. He said, "What have I done?" Witness replied, "You know what you have done. You know that **you** have ruined my girl." He hesitated a little bit and said, "Oh, I don't know. She didn't tell me." Witness said, "No, she says she told you and you agreed to marry her. That is the way you started it." He said, "Yes, I know I agreed to marry her. That is the way I overcame her. We were to go and get married. I told her if she would come across and have intercourse with me that we were going to get married; that we were engaged to get married and it would be all right." Witness said, "Now come on back and let's cover that up and be a man." He said, "I can't go now." Witness said, "Yes, you can go. Come on back now and cover that all up and no one will be the wiser," and he agreed to come back and said, "Well, I know I done wrong. I know I done it. I know I agreed to marry her, and I will go back and marry her."

Witness and appellant walked back to the station to find out what time they could get a train back to Little Rock. They could not get one that night and appellant said, "We will go over to Oklahoma City this evening. I will go back and get ready. Come and go with me, and we will have dinner together, and we will go back this evening." Witness said, "Joe, I'm so worn out I don't feel like going. Go ahead and come back over here." Appellant said, "I will be back between one and two o'clock." He went away to get his clothes, and witness never saw him any more until he got hold of him in the Mangrum jail in October. Witness made a trip after the appellant to try to get him to come back and cover his wrongs. He made another trip to Oklahoma to try to locate him and couldn't locate him, and witness then sent

a wire to Mangrum, Oklahoma, and got him there. Witness was a deputy sheriff and brought him back after he was arrested there.

After they arrived here (in Little Rock), witness and his two sons and appellant went into Snodgress' office and they fixed up there what they would do. Appellant told it there that he had agreed to marry her if she would have intercourse with him. He told witness and his two sons that he obtained intercourse with witness' daughter by promising to marry her. Witness had a pistol on all the time while he was in Snodgress' office. On cross-examination witness stated that his first trip to Oklahoma was in August of 1917. He had learned the day before he left from the doctor of his daughter's condition; had not talked with her. Witness met the appellant at El Reno, Oklahoma, and told him he had ruined his daughter and he said, ''Yes, I have,'' and made a clean breast of it and told witness that she was overcome by his promise to marry her. Appellant did not come back with witness at that time. He ran away. Witness then went for him again about the 12th of September. Witness went before a justice of the peace and got a warrant charging appellant with the crime of seduction. He took him from the jail at Mangrum and brought him to Oklahoma City hand-cuffed. There he took off the hand-cuffs. Witness notified his son the day before he left Oklahoma City that he was going to leave with appellant on a certain day. One of the witness' sons got on the train at Pinnacle and came on with witness and appellant to Little Rock. Witness' other son met them at the Tenth Street station in Little Rock. Witness went home and brought his daughter to Isgrig's office where the ceremony was performed. Witness sent his son with the appellant to get the license. Appellant was under arrest when he was married. There was no preparation made by witness' family for the wedding.

H. C. Wilder, a brother of the prosecutrix, testified that at Snodgress' office and while appellant was under arrest, the following conversation took place: He (ap-

pellant) said that he would agree to marry her if she would treat him right, and she told him she would treat him right if he would marry her, and she would live with him and do all she could for him, and he said he would marry her if she treated him right and which he promised to do and he married her. Witness was asked if he or anybody else made threats to him and answered, "No, sir." He was further asked, "did he make his statements freely and voluntarily and answered, "Yes." Witness further testified that they were married while the appellant was under arrest.

L. C. Wilder testified that he was a brother of the prosecutrix and met his father and brother and appellant at the Tenth Street station. He had received a telegram notifying him they would arrive. They went to Snodgress' office. The following conversation occurred between the appellant and witness: "He asked me what did I think about it and I said, 'Joe, now I am going to leave that to you. You have wronged the girl and I said it is your place to straighten it up.' He said, I know I have wronged the girl, and am willing to straighten it up. I promised her before we had this intercourse that I would marry her, and I am going to stick to it if there is any chance. He said he did not have any means to get married. He asked me if I would get him some clothes and give him some money to get married and I told him I would, and I went and bought him a suit of clothes and gave him money to buy his certificate and then gave him money to go to her home. After they were married, they went to my house and stayed all night with me, and the next day they started for her home at Wilder. He voluntarily made those statements to me. Nobody made any threats toward him. Shortly after that he abandoned and left her."

Several witnesses on behalf of the appellant testified that the general reputation of prosecutrix for truth and morality was bad, and also that her reputation for chastity was bad, and they would not believe her on oath. The appellant testified admitting that he had had sexual

intercourse with the prosecutrix, but he denied that before such intercourse he had made her any promise to marry her. He testified that he went to Oklahoma because her father had threatened to kill him, and when her father came to Oklahoma he told him he would come back, but that he would not marry his daughter upon any consideration. Appellant was arrested on a charge of seduction, was put in jail at Mangrum, Oklahoma, and Mr. Wilder, prosecutrix' father, came there for appellant. He further testified: "From the time I left Oklahoma City or Mangrum jail, he (Wilder) said I had to marry his daughter or he was going to kill me. Said I had my choice." He denied having any of the conversations testified to by the witnesses for the State. He stated that he told them he would marry her rather than be killed, but would not live with her. In regard to the alleged desertion he testified: "We went to Lem's house, stayed all night and I went to Conway next morning. I told her I was going home and would not be back. Made no promise to come back and have not been back since."

In rebuttal the State introduced the testimony of several witnesses who testified that the reputation of the prosecutrix for morality was good. At the conclusion of the testimony the appellant, among other prayers for instructions asked the court to direct the jury to return a verdict of not guilty, which the court refused, and to which the appellant duly excepted. The ruling of the court on this and the other prayers for instructions will be commented upon in the opinion.

Appellant moved for a new trial, alleging among other grounds, that since the verdict was rendered he had discovered that the prosecutrix testified before the grand jury that the appellant "promised to marry her after they had had intercourse." To sustain his motion on the ground of newly discovered evidence, appellant attached to his motion the original transcript of the testimony of the prosecutrix given before the grand jury, from which the above quotation is taken.

Appellant also introduced Houston Gean, who testified that he was deputy clerk or secretary to the grand jury, whose duty it was to write down and keep a record of the testimony of witnesses before the grand jury; that is, to take a synopsis of their testimony. This was done to furnish the prosecuting attorney with the correct information of what was testified before the grand jury. The witness transcribed substantially all the testimony that the prosecutrix gave before the grand jury, and understood that she testified substantially as above quoted. Witness had no memory of the case except from the statement taken down by him from which he refreshed his memory. In taking down the testimony, witness did not undertake to put down all the witness testified to. It happened frequently that a witness made a statement that was not put down. Witness did not know what questions were asked by members of the grand jury; did not undertake to put down questions or the answer to any particular question. Witness could not recall what prosecutrix said, if anything, about the appellant promising to marry her before the intercourse. She might have testified to that also. Witness did not understand it to be that way unless witness had so put it down. It is possible that witness might have misunderstood the prosecutrix. Witness took her testimony in response to questions as near as he could get what she said. What he put down was just a brief memorandum of what witness remembered of what she said. Witneses thought that if the prosecutrix had said before the grand jury that the promise of marriage was made before the intercourse, he would have put that down at the time. Witneses was of the impression that he stated correctly or substantially all that she said that was important. Witness was in a hurry and took the statement down in long hand, and it might have been that if prosecutrix stated in a running question that he had promised her before the intercourse witness might not have got it. The only thing witness knows about it is just what that record shows. Witness would have to stand on that and did not remember whether the inter-

course was before or after the promise. Witness had no other object than to arrive at her exact testimony at the time and to write it down.

R. C. Bright testified that he was clerk of the grand jury and remembered the testimony of prosecutrix, Eva Wilder. She stated that the defendant promised to marry her before she had intercourse with him, and that he had intercourse with her several times after that. The question was made plain as to whether the promise was made prior to the intercourse. Witness did not know why the deputy clerk of the grand jury did not write the answer down differently than he had. The grand jury expects a man to write correctly, and he is supposed to do so. He is expected and supposed to take down important things.

*Rhoton & Helm, Roy Bruce* and *Gardner K. Oliphint,* for appellant.

1. It was error to refuse to direct a verdict for appellant notwithstanding Kirby's Digest, § 2044. The burden was on the State to prove that defendant abandoned the prosecutrix, wilfully and without cause. Appellant was forced to marry her.

2. Defendant admitted the intercourse, but denied the promise to marry. There is no competent testimony corroborating the prosecutrix as to the alleged promise to marry. 50 Ark. 305; 2 Wigmore on Ev., § 1013, p. 1174.

3. Extrajudicial confessions are at best weak testimony. 4 Blackst. Com. 357; Best Prin. of Ev. (Am. Ed.) § § 555, 573. The burden was on the State to prove that the alleged admission was freely and voluntarily made. 22 Ark. 336. The rule as to the admission of this class of testimony is stated in 107 Ark. 557; 111 *Id.* 457, 464; 94 *Id.* 343. Defendant was under arrest at the time and it was not voluntary, as it was made under duress.

4. The testimony of the Wilders is not corroborative. 77 Ark. 16; 101 *Id.* 45; Kirby's Digest, § 2385; 77 Ark. 128; 50 *Id.* 305.

5. There was error in the instructions, both in giving and refusing. The only testimony as to the alleged promise of marriage, other than the alleged admission of defendant, is the testimony of the prosecutrix. 107 Ark. 581. Kirby's Digest, § 2385, is applicable in seduction cases. 77 Ark. 16; 101 *Id.* 45.

6. Defendant was entitled to have the specific instructions asked given to the jury. 60 Ark. Law Rep. 546-9; Brickwood's Sackett on Instructions, etc., § 179; 69 Ark. 134, 137-8; 76 *Id.* 227; 78 *Id.* 100. The error in giving an erroneous instruction is not cured by giving a correct one on the same subject if there is nothing to show which the jury followed. 85 Ark. 48. See also 76 *Id.* 225.

The instructions do not present a harmonious whole but a jargon of inexplicable contradictions. 79 Ark. 12; 89 *Id.* 213; 93 *Id.* 564; 77 *Id.* 129; *Ib.* 201, 437; 57 *Id.* 203. See also as to errors in instructions, 120 Ark. 202; 107 *Id.* 581; 111 *Id.* 464.

7. There was error in refusing defendant's instructions. 40 Ark. 482; 33 Mich. 112; 46 N. E. 1040; 59 Ark. 431; 71 *Id.* 398; 113 *Id.* 520; 62 Law Rep. 222, 232. Nowhere is the jury told what "chaste" character means. 40 Ark. 482; 157 Pac. 704; 22 S. E. 863; 21 *Id.* 502; 21 S. W. 764; 132 N. W. 431; 30 L. R. A. (N. S.) 173. See also Kirby's Digest, § 2385; 101 Ark. 45, and cases *supra;* 59 Ark. 431; 71 *Id.* 398.

8. It was error to refuse to permit counsel to ask defendant what the father of prosecutrix said in Oklahoma as to who was as likely to be the guilty person as defendant, and to propound the question to Tom Fisher.

9. A new trial should have been granted for newly discovered evidence. The motion complies with all the statutory requirements. 111 Ark. 399, 415; 69 *Id.* 545.

*John D. Arbuckle,* Attorney General, and *T. W. Campbell,* Assistant, for appellee.

1. The evidence is sufficient. Kirby's Digest, § 2044. The promise to marry was proven and the subsequent marriage and abandonment without just cause. The cor-.

roboration was sufficient. 92 Ark. 421; 126 *Id.* 98. The *corpus delicti* was proven and defendant's extra judicial confessions properly admitted. Kirby's Digest, § 2385; 111 Ark. 464. The testimony of the prosecutrix and his confessions make a case of seduction.

2. There was no error in modifying the instructions. 71 Ark. 398; 127 *Id.* 516.

3. No error in refusing instructions. 99 Ark. 175; 71 *Id.* 398; 73 *Id.* 139; 77 *Id.* 23; 84 *Id.* 67; 99 *Id.* 175; 84 *Id.* 67, 71; 36 *Id.* 653; 76 *Id.* 276; 73 *Id.* 407; 28 *Id.* 121; *Ib.* 531; 73 *Id.* 139.

4. No error in the instructions given by the court. Taken as a whole they correctly declare the law. 74 Ark. 431; 70 *Id.* 43; 72 *Id.* 544; 84 *Id.* 67; 126 *Id.* 98; 92 *Id.* 421; 77 *Id.* 472; 84 *Id.* 67.

5. No error in the exclusion of evidence. 34 Ark. 480; 130 *Id.* 365.

6. The newly discovered evidence does not justify a reversal. No abuse of discretion by the court is shown. The memoranda of Mr. Gean were not competent. They were not official nor shown to be accurate. No excuse is shown for not finding this evidence sooner.

WOOD, J., (after stating the facts). 1. Under Section 2044 of Kirby's Digest, one who is being prosecuted for seduction may have the prosecution suspended by marrying the female alleged to have been seduced, and the prosecution shall not be revived unless the accused wilfully and without legal cause abandons such female. This statute was for the benefit of the accused and was intended to give him an opportunity to volutarily condone his offense by making reparation as far as possible to the injured female whose confidence he had betrayed. But the statute has no application in a case where the defendant has submitted to a marriage ceremony under duress. Therefore, if it be true, as appellant contends, that he was forced to submit to the marriage ceremony, then there was no marriage at all and hence no wilful aban-

donment, and the statute under his own contention would have no application.

Under the evidence adduced, the reading of the above statute was abstract, but it could not have prejudiced appellant's rights. For if the ceremony was forced upon the appellant, then the prosecution should not have been suspended, and if the marriage ceremony was valid, then the undisputed testimony shows that appellant without any legal cause wilfully abandoned the prosecutrix.

2. Appellant admitted the sexual intercourse, and further corroboration of the prosecutrix as to this was unnecessary. The testimony of the father of the prosecutrix as to the conversation he had with appellant on the first trip to Oklahoma tended to prove that the confession made by the appellant as to the promise of marriage was voluntary. The confession having once been voluntarily made, the fact that appellant afterwards repeated the confession under circumstances which tended to prove that he was under duress, did not destroy or lessen the effect of his previous voluntary confession and the testimony of the Wilders as to what took place in and on the way to Snodgress' office concerning the confession as to the promise of marriage was in no manner prejudicial to the appellant. The prosecutrix, under the facts set forth in the statement, was corroborated by competent testimony as to the promise of marriage. See *Oaks* v. *State,* 135 Ark. 221; *Patrick* v. *State,* 135 Ark. 173.

The appellant could not have been convicted upon his confession alone. Sec. 2385 of Kirby's Digest; *Melton* v. *State,* 43 Ark. 367; *Hubbard* v. *State,* 77 Ark. 126; *Greenwood* v. *State,* 107 Ark. 581; *McLemore* v. *State,* 111 Ark. 457. Nor could he have been convicted alone upon the uncorroborated testimony of the prosecutrix. Sec. 2043 of Kirby's Digest.

But there is nothing in these statutes and decisions which forbids conviction on a charge of seduction upon the testimony of the prosecutrix when corroborated by the confessions made by the accused out of court. On the contrary, while the proof of the *corpus delicti* by the tes-

timony of the prosecutrix alone would not be sufficient to convict, yet when her testimony establishing the *corpus delicti* is corroborated by the confessions of the accused out of court, the testimony of the two combined is sufficient to convict, there being no statutory or common law rule to the contrary. The statutes referred to do not prohibit the introduction of the testimony of the prosecutrix and of the introduction of the testimony showing the confessions of the accused out of court, nor the consideration of same by the jury. We know of no rule of law which prohibits a conviction upon the testimony of the prosecutrix when corroborated by the confessions, out of court, of the accused. See *Hubbard* v. *State, supra,* syllabus 2; *Harshaw* v. *State,* 94 Ark. 343, syllabus 2; *Meisenheimer* v. *State,* 73 Ark. 407; *McLemore* v. *State, supra.* The court did not err in refusing appellant's prayers Nos. 22 and 22½ for instruction to the contrary.

3. The court instructed the jury, in conformity with the law as announced in many of our previous decisions in substance, that in order to convict the defendant the jury must find from the evidence beyond a reasonable doubt that the accused obtained carnal knowledge of the prosecutrix by virtue of an express promise of marriage, and that the testimony of the prosecutrix must be corroborated both as to the promise of marriage and the act of sexual intercourse; that the previous want of chastity was matter to be set up in defense, and that the burden was upon the defendant to prove it by a preponderance of the evidence; that if the evidence on that issue in connection with the other evidence raised a reasonable doubt in the minds of the jury as to the guilt of the accused, he was entitled to an acquittal; that the burden rested upon the State to prove the guilt of the accused beyond a reasonable doubt. The court correctly declared the law on reasonable doubt, credibility of witnesses, and the burden of proof. Also correctly submitted to the jury the issue as to whether the appellant confessed to the crime charged, and as to whether these confessions were freely and voluntarily made, and instructed

them that unless they were so made the jury could not consider them.

The appellant, among other instructions, prayed the court to instruct the jury that, before the appellant could be convicted, they must find that he obtained carnal knowledge of the prosecutrix solely and alone by virtue of the promise of marriage. The court struck out the words "solely" and "alone" but instructed the jury, as before stated, that before the appellant could be convicted the testimony must show that he had sexual intercourse with the prosecutrix by virtue of a promise of marriage, and the court further instructed the jury at the request of the appellant as follows: "If you find from the testimony that the prosecutrix yielded her virtue to the defendant because of any other reason than an express or feigned promise of marriage made to her by him, you should find the defendant not guilty."

The appellant contends that because there was testimony tending to prove that the prosecutrix's reputation for morality was bad and because she testified that she consented to the act of sexual intercourse on account of his promise to marry her and her love for him, the court erred in striking from appellant's prayer the words "solely" and "alone"; that the striking of these words prevented the jury from considering whether or not the intercourse on the part of the prosecutrix was prompted by her lustful passion, rather than by the promise of marriage. In *Taylor* v. *State,* 113 Ark. 525, we used the following language concerning our seduction statute: "But this statute can only be invoked by the female who to the very time of her fall had held her virtue, so to speak, as 'the immediate jewel of her soul;' and who was only induced to surrender it through the promise of the man whom she trusted to marry her and solely from a desire to have him keep that promise. The woman who yields her virtue for sexual pleasure and uses the promise of marriage only as a cloak or subterfuge to hide her disgrace, is not within the pale of the protection of this particular statute."

The court did not err in its ruling. The jury were expressly told that if the prosecutrix yielded her virtue ''because of any other reason than an express or feigned promise of marriage made to her by him they should acquit the defendant.'' The appellant presented 30 prayers for instructions, and it would unduly prolong this opinion to discuss his exceptions to the ruling of the court in passing upon these prayers. Some were given as asked, others were modified and given, and others refused. The charge of the court taken as a whole was exceptionally free from error. It covered fully every phase of the case as developed by the testimony adduced.

4. The court did not err in refusing a new trial on the alleged ground of newly discovered evidence. The minutes of the testimony before the grand jury could not be used as original evidence. These minutes are preserved for the use of the grand jury and the prosecuting attorney. Secs. 2195, 2196 of Kirby's Digest. The prosecutrix might have been impeached by showing that she made statements in her testimony before the grand jury contradicting those she made on trial, but the minutes before the grand jury could not be used for such purpose. They could only be used to refresh the memory of members of the grand jury who might have been called as witnesses on the issue as to whether she had made contradictory statements. The testimony of witness Gean would have been competent but no proper foundation was laid for the introduction of such testimony by asking the prosecutrix whether she had made the alleged statement before the grand jury.

The cases of *Bussey* v *State,* 69 Ark. 545, and *Myers* v. *State,* 111 Ark. 399, upon which learned counsel for appellant rely are not applicable for the reason that in those cases the prosecutrix, having testified to a certain state of facts at the trial, afterwards made an affidavit to the effect that her testimony given at the trial was untrue. Here the prosecutrix has made no such affidavit and no such issue is raised. Moreover, the appellant does not set up in his motion for a new trial on the ground of

ARK.] WEBB *v.* K. C. So. RY. Co. 107

newly discovered evidence, facts showing that he had used due diligence. The indictment was returned in February and the trial was not had until June thereafter. The appellant does not set up and prove that he could not have discovered this evidence as well soon after the indictment was returned against him as during the few days that intervened between the trial and the filing of the motion. The memorandum was on file. The appellant must have anticipated that the prosecutrix had testified before the grand jury and would testify on the trial to facts that would tend to support the charge, and due diligence exacted of him that he should make reasonable inquiry to discover any facts in existence that would tend to break down her testimony. The party asking for a new trial for newly discovered evidence should not only state in his motion that he did not know of the existence of the testimony in time to produce it at the trial, but should also show facts from which it will appear that he could not have ascertained or obtained it by reasonable diligence. *McDonald* v. *Daniel,* 103 Ark. 589; *Ary* v. *State,* 104 Ark. 212, and other cases collated in Crawford's Digest, 3817-18, § 42.

There are no reversible errors in the record, and the judgment is, therefore, affirmed.